UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
DIANA NOAKES,                            :
                                         :
                     Petitioner,         :
                                         :  10 Civ. 5141 (CM)(THK)
                                         :        PRO SE
                                         :
          -against-                      :
                                         :  **REPORT AND RECOMMENDATION**
SABINA KAPLAN, Superintendent of         :
Bedford Hills Correctional Facility,     :
                                         :
                     Respondent.         :
------------------------------------X

**TO: HON. COLLEEN MCMAHON, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

On May 19, 2006, Petitioner Diana Noakes[1] was convicted of one

count of Assault in the First Degree, N.Y. Penal Law §

120.10(2)(McKinney 1996),[2] following a jury trial in New York

Supreme Court, Bronx County.  On July 7, 2006, she was sentenced,

as a second violent felony offender, to a determinate prison term

---

[1] The State brought an indictment against Diana Noakes, also
known as Adell Chandler, also known as Adell Robinson.  (See
Trial Tr. doc. 13, May 1, 2006 ("Tr. A"), at 5.)  Petitioner
reported to the court that her birth name was Adele Chandler, but
she later married Lemar Noakes (see Trial Tr. doc. 11, June 6,
2006 ("Tr. B"), at 11), and goes by both Diana Noakes (see Trial
Tr. doc. 12, May 1, 2006 ("Tr. C"), at 892), and Adele Chandler
(see Tr. B at 16).  Lakeisha Gilyard, the victim of the assault,
identified Petitioner as Adell Robinson.  (See Tr. A at 35, 624.)

[2] Petitioner was charged with one count of Assault in the
First Degree With Intent to Cause Serious Physical Injury, a
second count of Assault in the First Degree With Intent to
Disfigure Seriously and Permanently, and Assault in the Second
Degree.  (See Tr. C at 1011-16.)  Petitioner was convicted only
on the second count.  (See id. at 1058-60, 1090.)

COPIES MAILED
TO COUNSEL OF RECORD ON _12/21/11_

of thirteen years, to be followed by five years of post-release supervision.  Petitioner is presently incarcerated in the Bedford Hills Correctional Facility.

Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming that (1) the evidence at trial failed to prove her guilt beyond a reasonable doubt and the verdict was against the weight of the evidence; (2) she was deprived of her constitutional right to a fair and impartial jury because the trial court improperly denied her attorney's challenge for cause to a prospective juror; and (3) she received ineffective assistance of counsel because her attorney made incriminating statements about her at sentencing.

The Petition was referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(C).  For the reasons that follow, this Court respectfully recommends that the Petition be denied.

## BACKGROUND

### I.  Facts

In June 1997, Lakeisha Gilyard began dating a man named Tyson, who worked at a barbershop in the Bronx.  (See Tr. C at 674.)  In July 1997, Ms. Gilyard was standing outside the barbershop with Tyson when she saw a woman drive past in a white Acura Legend.

2

(See id. at 676-78.)   Tyson informed Ms. Gilyard that the woman, named Adell, was his girlfriend.   (See id. at 676-78.)   Upon learning this information, Ms. Gilyard stopped dating Tyson, but the two remained friends.   (See id. at 676-78.)   In July 1998, Ms. Gilyard was with Tyson at the barbershop when she ran into Adell again.   (See id. at 679.)   Adell asked if Ms. Gilyard was dating Tyson.   (See id. at 679.)   Ms. Gilyard told her that she was not dating him anymore and then got into a cab and left.   (See Tr. C at 679-81.)   The next time Ms. Gilyard saw Adell was at the end of 1998 or the beginning of 1999, when she noticed Adell watching her at a club.   (See id. at 682-83.)

On November 12, 1999, at approximately 6:00 A.M., Ms. Gilyard was arriving home with two friends, Tracy Jackson and Ana Hernandez, when she heard Adell call to her from a white Acura Legend.   (See id. at 683-84, 690.)   Ms. Gilyard testified that she knew the woman in the car and went to speak with her, while Ms. Jackson waited in front of the building.   (See id. at 685.)   Adell and Ms. Gilyard talked for about five or ten minutes.   (See id. at 690-91.)   Then, Adell grabbed the back of Ms. Gilyard's hair and started swinging her arms at her.   (See id. at 693-95, 857.)   Ms. Jackson stood in the middle, trying to break up the fight.   (See id. at 693, 856.)   Adell cut Ms. Gilyard on her scalp, forehead,

ear, and right arm,[3] then ran away and left in her car.   (See id. at 694-96, 651.)

Ms. Gilyard was transported to Lincoln Hospital, where she was treated by Dr. John Scott Bomann.   (See id. at 698, 651.)   Her injuries required over one hundred stitches.   (See id. at 654-55.) Dr. Bomann testified that Ms. Gilyard could have died had she not received medical attention within one to two hours.   (See id. at 657.)

### A.   Lost Police Reports and Evidence

While Ms. Gilyard received medical attention, police officers brought Ms. Jackson and Ms. Hernandez to the 44th Precinct station house, where they were interviewed about the incident.   (See id. at 860.)   Ms. Jackson provided a written statement.   (See id. at 860-61.)   The written statement and notes from these interviews were not turned over to Petitioner's trial counsel, and the Assistant District Attorney stated that the prosecution no longer had the documents.[4]   (See id. at 861, 871-75.)

---

[3] Ms. Gilyard did not see the weapon Adell used to cause these injuries.   (See id. at 695.)   The weapon was sharp enough to cut through Ms. Gilyard's jacket.   (See id. at 696.)   Police later found a blade at the crime scene.   (See id. at 827-28, 867.)

[4] During her testimony at trial, Ms. Jackson recalled that Adell was slightly taller than 5 feet and 6 inches, had "medium brown" skin, and brownish hair in curls.   (See id. at 851, 870.) She did not recognize Petitioner as the assailant at trial.   (See id. at 851.)

4

After the interviews, Ms. Jackson and Ms. Hernandez were taken back to Ms. Gilyard's apartment building by a police officer. (See id. at 860.)   There, the officer asked Ms. Jackson "how the situation played out," and she told him. (Id. at 866)   She pointed out a blade lying on the ground,[5] and she remembers the officer picking it up. (See id. at 867.)   This blade was lost by the police. (See id. at 836.)

Sergeant James Bricker was on duty as a patrol supervisor on the overnight shift on November 12, 1999. (See id. at 824.)   He went to the apartment after the attack, established a crime scene, and completed an "unusual occurrence report."[6] (See id. at 825-27.)   Sergeant Bricker testified that he could not remember what was in the unusual occurrence report, but he did remember seeing a blade at the crime scene. (See id. at 827-828.)   He said that the blade was turned over to an officer at the scene, but did not know what happened to it. (See id. at 836.)   The unusual occurrence report would contain a list of all the officers and detectives that responded, but this report was not found before trial, (see id. at

---

[5] Ms. Jackson stated that she "pointed out to [the officer] the blood and stuff that was on the floor and the blade that was on the floor.  He did acknowledge it, because he was the one that picked it up."  (Id. at 867.)

[6] This report documents information from events considered unusual occurrences.  (See id. at 825-27.)   Examples of unusual occurrences include stabbings and shootings.  (See id. at 825-27.)

826-28, 837-38,) and was not turned over to Petitioner's trial counsel.  (See id. at 875.)

Ms. Gilyard spoke with the police soon after she was attacked. (See id. at 702.)  She testified that she told them that a woman named Adell assaulted her, but she did not know Adell's last name or where she lived.  (See id. at 703.)  The notes from this interview were not turned over to Petitioner's trial counsel.  (See id. at 871-75.)  The police documents that were turned over to Petitioner's trial counsel included: an original sprint report for the incident,[7] a computer-generated 61 complaint report,[8] and an original aided report.[9]  (See Tr. C at 873-74.)  At trial, the court instructed the jury that "police records and items, as you know, are missing.  You may, although you're not required to, you

---

[7] A sprint report is generated by the police department whenever a 911 call is made.  The report reflects the content of the call and the nature and content of any police radio transmissions made in connection with the call.  See Huggins v. Girdick, No. 03 Civ. 3248(NG)(VVP), 2007 WL 433397, at *3 n.3 (E.D.N.Y. Feb. 7, 2007) (citing Anthony v. City of New York, No. 00 CV 4688, 2001 WL 741743, at *4 (S.D.N.Y. July 2, 2001); Bonilla v. Portuondo, No. 00 Civ 2369, 2004 WL 350694, at *8 n.6 (S.D.N.Y. Feb. 26, 2004)).

[8] A 61 complaint report, also known as a UF61 or a UF-61 report, is a complaint report filled out by a police officer. See Jones, v. Rick, No. 02 CV 2719(JG), 2004 WL 212908, at *4 n.2 (E.D.N.Y. Jan. 28, 2004); Lewis v. Philips, No. 04 Civ. 1117(BSJ)(DFE), 2009 WL 362290, at *5 (S.D.N.Y. Feb. 13, 2009).

[9] An aided report records occurrences "when police interact with a person who requires medical attention."  See Cerbelli v. New York, No. 99-CV-6846 (ARR)(RML), 2008 WL 4449634, at *17 n.21 (E.D.N.Y. Oct. 1, 2008).

may construe the missing evidence against the People." (Id. at 1006.)

**B.   Identification of Petitioner**

Ms. Gilyard did not identify Petitioner as her assailant until four and a half years after the assault.  Ms. Gilyard saw Petitioner three times after she was attacked and did not call the police.  Ms. Gilyard saw Petitioner in 2003 at the corner of 204th Street and Webster Street.  (See id. at 708.)  Ms. Gilyard looked at Petitioner for "a good two minutes," and then Petitioner turned her back.   (Id. at 709.)  Ms. Gilyard did not call the police because she was unsure if Petitioner was her assailant.  (See id. at 708-9.)  Ms. Gilyard saw Petitioner again, but at a distance, in a supermarket in March 2004.  (See id. at 709-11.)  Again, Ms. Gilyard did not call the police because she was not sure that the woman she saw had been her assailant.  (See id. at 710-11.)  Ms. Gilyard saw Petitioner at her housing complex on May 1, 2004, and Petitioner avoided making eye contact.  (See id. at 711-12.)  This time Ms. Gilyard was sure Petitioner was her assailant, but Petitioner vanished before Ms. Gilyard could call the police. (See id. at 711-12.)

On May 6, 2004, Ms. Gilyard called the police to report an incident with her son at his school.  (See id. at 716-717.)  As she stood outside the school, Petitioner walked past her. (See id.

7

at 717.)  She had "a short, blond haircut" and "an earring" [sic]
in the "center of her chin."  (Id. at 718.)  When Police Officers
Morales and Pollick arrived about five minutes later, Ms. Gilyard
told them about the assault and showed them her scars.  (See id. at
718-720.)  She also told them that the person who assaulted her was
named Adell, gave them a physical description of Petitioner, and
indicated in which direction Petitioner had walked.  (See id. at
719-722.)

    The officers canvassed the area with Ms. Gilyard.  (See id. at
720-21.)  She saw Petitioner walk out of a store and told the
officers.  (See id. at 721-722.)  The officers approached her and
asked for her name.  (See id. at 884.)  Petitioner did not answer.
(See id. at 884.)  Officer Morales asked her for her name several
more times and she still refused to respond.  (See id. at 885.)
Officer Morales then asked Petitioner if she would remove her hands
from her pockets.  (See id. at 793-795, 885.)  She refused to do
so.  (See id. at 886.)  He asked her at least two more times, and
then she put her hands behind her thighs.  (See id. at 886.)
Officer Morales ordered her to place her hands "where [he] could
see them" two or three times, and initially, she refused to comply.
(Id. at 887.)  When she moved her hands, Officer Morales saw that
she had "DELL" tattooed above her knuckles.  (See id. at 887-888.)
The officers arrested Petitioner and brought her to the 46th

8

Precinct.  (See id. at 889.)  Petitioner refused to give her name
to the officers at the precinct.  (See Tr. C at 889-890.)  After
twenty minutes, she finally told the police her name was Diana
Noakes.  (See Tr. C at 892.)

####   C.   **Trial**

A grand jury returned an indictment against Diana Noakes, also
known as Adell Chandler, also known as Adell Robinson.  (see Tr. A
at 5.)  Petitioner was tried by jury in New York Supreme Court,
Bronx County (see id. at 618).

During the fifth round of voir dire, the court asked the
prospective jurors if they or anyone close to them worked in law
enforcement.  (See id. at 440.)  Juror #7, Eduardo Hernandez, said
that both he and his uncle were in the military police.  (See id.
at 440.)  Nonetheless, he said that he would have no trouble
judging police witnesses like any other witnesses.  (See id. at
441.)  When the court later asked for his personal information, he
disclosed that he worked as an undercover store detective.  (See
id. at 462.)  He did not carry a weapon, only handcuffs, but had
made "arrests" for shoplifting.  (See id. at 463.)  After he
"arrested" someone, he called for the police and they would make
the formal arrest.  (See id. at 464.)  Mr. Hernandez never
testified in court on any of these cases.  (See id. at 464.)  Mr.
Hernandez testified that, despite his background, he believed he

9

could fairly judge the credibility of police witnesses and the merits of the case. (See id. at 464-65.)

Upon questioning by the prosecutor, Mr. Hernandez first explained that he would require more than just one eyewitness to establish the elements of the crime before he could decide that someone was guilty. (See id. at 480.)  The court instructed the prospective jurors that the testimony of "one eyewitness to an alleged event is sufficient for you to vote guilty, if you believe that witness beyond a reasonable doubt." (See id. at 483.)  Mr. Hernandez agreed that he could accept the testimony of one eyewitness to prove an alleged crime. (See id. at 484.)

Mr. Hernandez had seen many people in handcuffs. (See id. at 500.)  Upon questioning by defense counsel, Mr. Hernandez initially testified that he viewed defendants as innocent, but later admitted that when he sees someone in handcuffs, he thinks that "[t]hey've done something." (See id. at 499-500.)

Petitioner's counsel challenged Mr. Hernandez for cause because he had not been forthcoming about his law enforcement experience. (See id. at 514.)  Counsel stated that he thought Mr. Hernandez was telling the court what he thought it wanted to hear instead of what he actually believed. (See id. at 514-15.)  The prosecutor responded that Mr. Hernandez's background was not a reason for him to be removed from the jury. (See id. at 515.)  The

court denied the challenge.  (<u>See</u> <u>id.</u> at 517.)  The court stated
that Mr. Hernandez's law enforcement background was peripheral
because he made no arrests and never testified in court.  (<u>See</u> <u>id.</u>
at 516.)  The court also noted that Mr. Hernandez's initial
responses about wanting corroboration of one eyewitness were more
favorable to the defense, and that he ultimately pledged to accept
the law as the court explained it to him.  (<u>See</u> <u>id.</u> at 516-17.)
Petitioner's counsel used a peremptory challenge to strike Mr.
Hernandez from the jury.  (<u>See</u> <u>id.</u> at 518.)  Trial counsel
ultimately exhausted his allotment of fifteen peremptory challenges
before <u>voir</u> <u>dire</u> was concluded.  (<u>See</u> <u>id.</u> at 600.)  Petitioner was
convicted of one count of Assault in the First Degree, on May 19,
2006.  (<u>See</u> Tr. C at 1090-93.)

**II. Procedural History**

    **A.   Direct Appeal**

    On June 27, 2008, Petitioner filed a direct appeal to the
Appellate Division, First Department.  Petitioner claimed that (1)
the evidence failed to prove her guilt beyond a reasonable doubt
and the verdict was against the weight of the evidence; and (2) she
was deprived of her constitutional right to a fair and impartial
jury when the trial court improperly denied her attorney's
challenge for cause to prospective juror Hernandez.

On December 11, 2008, the Appellate Division unanimously affirmed Petitioner's conviction. See People v. Noakes, 57 A.D.3d 280, 281, 869 N.Y.S.2d 424, 425 (1st Dep't 2008). The New York Court of Appeals denied leave to appeal on March 19, 2009. See People v. Noakes, 12 N.Y.3d 786, 879 N.Y.S.2d 63 (2009). Petitioner's judgment of conviction became final on June 17, 2009, ninety days after she was denied leave to appeal her conviction to the New York Court of Appeals. Petitioner did not seek a writ of certiorari to the Supreme Court of the United States, nor did she file any state collateral challenges to her conviction.

**C.   Federal Habeas Corpus Petition**

Petitioner signed and dated the instant Petition on May 3, 2010[10] and the Court received it on July 6, 2010. Respondent does not dispute the timeliness of the Petition. The Petition includes both of the claims Petitioner asserted in her direct appeal,[11] and a third claim that Petitioner received ineffective assistance of counsel when her attorney made incriminating statements about her at sentencing. (See Pet. at 5.) Respondent submitted an affidavit

---

[10] The Petition was handwritten into a form that contained two signature lines: one stating that the contents of the Petition are "true and correct" and an additional signature line at the very bottom of the page declaring the date the Petitioner will deliver the Petition to prison authorities. Petitioner signed and dated the first signature line on May 3, 2010, and overlooked the second signature line. (See Petition for Writ of Habeas Corpus, dated May 3, 2010 ("Pet."), at 8.)

[11] Respondent concedes that these two claims have been exhausted.

12

in opposition to the Petition, arguing that (1) Petitioner's ineffective assistance claim is unexhausted and procedurally barred; and (2) the Appellate Division's rejection of Petitioner's exhausted claims was neither contrary to nor an unreasonable application of clearly established federal law. (See Respondent's Declaration in Opposition to Petition for a Writ of Habeas Corpus, dated Nov. 30, 2010, at 4-5.)

On January 21, 2011, Petitioner submitted a Reply which, in addition to responding to the assertions in Respondent's brief, raised for the first time five additional claims: (1) the trial judge erred in allowing the jury to consider the charge of First Degree Assault with Intent to Disfigure after it had acquitted Petitioner of First Degree Assault with a Deadly Weapon/Dangerous Instrument; (2) Petitioner was denied the right to a speedy trial; (3) the trial judge improperly excused a juror for cause, on the People's request, over her attorney's objection; (4) the trial judge's refusal to allow a defense witness to testify violated her right to present a defense; and (5) Petitioner's appellate counsel was ineffective for failing to preserve unspecified constitutional claims. (See Petitioner's Reply to Respondent's Declaration in Opposition to the Habeas Corpus Pet., dated Jan. 25, 2011 ("Reply"), at 2-13.)[12]  The Reply also requested a stay to pursue

_____

[12] These claims were not in the Petition and were never raised and exhausted in the New York courts.

post-conviction remedies and an evidentiary hearing. (See id. at 6.)

## DISCUSSION

### I.  AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000); accord Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006); Ernst J. v. Stone, 452 F.3d 186, 193 (2d Cir. 2006). The phrase "clearly established Federal law" limits the law governing a habeas

14

petitioner's claims "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006) (quoting Williams, 529 U.S. at 365, 120 S. Ct. at 1499); accord Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006).

"The 'unreasonable application' standard is independent of the 'contrary to' standard . . . [and] means more than simply an 'erroneous' or 'incorrect' application" of federal law." Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (citing Williams, 529 U.S. at 410, 120 S. Ct. at 1522).   A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case.   See Williams, 529 U.S. at 413, 120 S. Ct. at 1523.   The inquiry for a federal court with regard to a habeas petition is not whether the state court's application of the governing law was erroneous or incorrect, but, rather, whether it was "objectively unreasonable." Id. at 408-10, 120 S. Ct. at 1521-22; see also Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently.   The state court's application must reflect some

15

additional increment of incorrectness such that it may be said to be unreasonable.").

Moreover, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.   The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility.").   A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

## II.  Sufficiency of the Evidence

Petitioner claims that the evidence at trial was legally insufficient to support Petitioner's conviction.[13]   Petitioner

---

[13] Petitioner claims that the evidence at trial failed to prove her guilt beyond a reasonable doubt and the verdict was against the weight of the evidence. The claim has two parts, a legal sufficiency claim and a "weight of the evidence" claim. Because a "weight of the evidence" claim is a purely state law claim, it is not cognizable in a federal habeas proceeding. See Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475, 480 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); McKinnon v. Supt., Great Meadow Corr. Facility, 422 Fed. App'x 69, 75 (2d Cir. 2011)("the argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus").  This Court therefore addresses only the legal sufficiency aspect of this claim.

exhausted this claim by raising it in her direct appeal to the Appellate Division, which concluded "there is no basis for disturbing the jury's determinations concerning identification and credibility . . . and the victim's identification of defendant was corroborated by circumstantial evidence." Noakes, 57 A.D.3d at 281, 869 N.Y.S.2d at 425.

A "sufficiency of the evidence" claim is based on federal due process principles. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) ("the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). It is well-established "that in challenging the sufficiency of the evidence to support [a] conviction, a defendant bears a heavy burden." United States v. Abelis, 146 F.3d 73, 80 (2d Cir. 1998) (quoting United States v. Giraldo, 80 F.3d 667, 673 (2d Cir. 1996)); accord Quirama v. Michele, 983 F.2d 12, 14 (2d Cir. 1993). To overturn a conviction based on insufficiency of the evidence, a petitioner must establish that, viewing "the evidence in the light most favorable to the State . . . no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002); accord Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995).

17

"[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326, 99 S. Ct. at 2793; <u>see also</u> <u>Dixon v. Miller</u>, 293 F.3d 74, 81 (2d Cir. 2002) ("[T]he government receives the benefit of having all permissible inferences drawn in its favor.") (citations omitted).

AEDPA precludes a court from granting a petition for a writ of habeas corpus on the grounds of insufficiency of the evidence unless the state court unreasonably applied the principles underlying the <u>Jackson</u> standard when reviewing a petitioner's claim. <u>See</u> <u>Langston v. Smith</u>, 630 F.3d 310, 320 (2d Cir. 2011); <u>Davis v. Miller</u>, No. 99 Civ. 2423 (RWS), 1999 WL 1125055, at *3 (S.D.N.Y. Dec. 8, 1999).

Petitioner was convicted of Assault in the First Degree. New York Penal Law § 120.10(2) states that a person is guilty of this crime when "[w]ith intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person." Petitioner argues that the evidence at trial was legally insufficient to support her conviction because

18

she was identified four-and-a-half years after the crime occurred.
Although Ms. Gilyard saw Petitioner several times in the interim,
she did not identify her as the assailant.  The Court further reads
the Petition as contending that because the police reports about
the incident were lost,[14] there was no evidence to corroborate Ms.
Gilyard's questionable identification.

Petitioner does not satisfy the stringent requirements for
habeas relief.  Even "the testimony of a single, uncorroborated
eyewitness is generally sufficient to support a conviction."
Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983) (quoting United
States v. Danzey, 594 F.2d 905, 916 (2d Cir.), cert. denied, 441
U.S. 951, 99 S. Ct. 2179 (1979)); accord United States v. Frampton,
382 F.3d 213, 222 (2d Cir. 2004); see also Tibbs v. Florida, 457
U.S. 31, 45 n.21, 102 S. Ct. 2211, 2220 (1982) (noting that the due
process requirements of Jackson are clearly met where the
prosecution presented eyewitness testimony about the crime).  Ms.
Gilyard is the only person who identified Petitioner as her

---

[14] Although Petitioner does not claim that her rights under
Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), were
violated, she does reference police reports and evidence from the
crime scene that were lost by the police and never presented at
trial.  This Court reads Petitioner's submissions  as contending
that this evidence was necessary because the eye-witness
testimony was insufficient to support her conviction.  Based on
the standard that even "a single, uncorroborated eyewitness is
generally sufficient to support a conviction," Edwards v. Jones,
720 F.2d 751, 755 (2d Cir. 1983), the absence of this evidence is
not enough to show that the evidence at trial was legally
insufficient to support her conviction.

assailant.[15]   But, as the Appellate Division noted, "the victim's identification of defendant was corroborated by circumstantial evidence." Noakes, 57 A.D.3d at 281, 869 N.Y.S.2d at 425.   Ms. Jackson, who also witnessed the crime, provided a description of the assailant for the jury.   Additionally, Ms. Gilyard testified that she told the police she was assaulted by a woman named Adell.[16] Petitioner ultimately admitted that her birth name was Adell and she had the letters "DELL" tattooed on her fingers.

Whether Ms. Gilyard's testimony and identification of Petitioner were credible was a matter for the jury to decide.   This Court cannot substitute its own assessment of the credibility of the witnesses.   See United States v. James, 239 F.3d 120, 124 (2d Cir. 2000)("Moreover, the credibility of witnesses is the province of the jury and we simply cannot replace the jury's credibility determinations with our own.")(internal quotations and citations omitted); United States v. Shulman, 624 F.2d 384, 388 (2d Cir. 1980) ("Under our system of jurisprudence . . . normally the resolution of issues of credibility is exclusively the province of the jury."); Rosa v. Herbert, 277 F. Supp. 2d 342, 347 (S.D.N.Y. 2003) ("In assessing [a] petitioner's claim, the court must defer to the jury's assessments of . . . the credibility of witnesses.")

---

[15] Ms. Gilyard identified Petitioner as her assailant to the police, (see Tr. C at 719-722,) and at trial (see id. at 676).

[16] Because the police records from this interview were not produced by the State, the court advised the jurors that they could construe the missing evidence against the People.

(citing Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996)); accord
Lee v. Senkowski, No. 02 Civ. 3334 (BSJ)(JCF), 2003 WL 22890405 at
*7 (S.D.N.Y. Dec. 2, 2003) (Report and Recommendation, adopted on
Apr. 29, 2004) ("Insofar as identification evidence is concerned,
it is well within the province of the jury to determine the
reliability of a witness' memory and observational powers."). The
jury was aware that Ms. Gilyard identified Petitioner four-and-a-
half years after her attack, and did not identify Petitioner as her
assailant on other earlier occasions when she saw her. It was for
the jury to determine whether Ms. Gilyard's identification of
Petitioner was credible and trustworthy.

The Appellate Division concluded that "there is no basis for
disturbing the jury's determinations concerning identification and
credibility . . . and the victim's identification of defendant was
corroborated by circumstantial evidence." Noakes, 57 A.D.3d at 281,
869 N.Y.S.2d at 425. This was not an unreasonable application of
the Jackson standard. The Court therefore recommends that
Petitioner's claim regarding the sufficiency of the evidence be
denied.

## III. Denial of For Cause Challenge of a Prospective Juror

Petitioner claims that the trial judge's denial of a challenge
for cause of prospective juror Hernandez violated her right to a
fair and impartial jury. The prospective juror was an undercover

21

store detective who worked in the military police and with the New York City Police Department.  Petitioner's attorney ultimately used a peremptory challenge to remove this prospective juror.  Because the juror did not sit on the jury and the loss of a peremptory challenge is not a constitutional violation, this Court recommends that this claim be denied.

The Constitution guarantees every defendant the right to a trial by an impartial jury.  U.S. Const., amends. VI, XIV.  The loss of a peremptory challenge, however, does not give rise to a violation of this right.  "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." Ross v. Oklahoma, 487 U.S. 81, 88, 108 S. Ct. 2273, 2278 (1988); accord Skilling v. United States, __ U.S. ___ , 130 S. Ct. 2896, 2923 n.31 (2010); United States v. Martinez-Salazar, 528 U.S. 304, 305 (2000).  The Supreme Court has noted that "we have long recognized . . . [that] unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension." Martinez-Salazar, 528 U.S. at 311 (finding there was no violation of the Sixth Amendment when the petitioner used a peremptory challenge to remove a prospective juror when the trial judge denied his for cause challenge).  Thus, even if Petitioner was forced to use a peremptory challenge to

22

remedy an erroneous denial of her challenge for cause, this in itself does not give rise to a Sixth Amendment violation.

As there is no contention here that the jury which heard Petitioner's case was not impartial, Petitioner fails to demonstrate a constitutional violation. Accordingly, the Court respectfully recommends that Petitioner's jury claim should be dismissed.

## IV.   Ineffective Assistance of Trial Counsel

Petitioner's third claim is that her trial counsel was ineffective because he made incriminating statements about her at sentencing. Because Petitioner failed to exhaust this claim in the New York courts, the claim should be dismissed.

Before a federal court may consider a state prisoner's petition for a writ of habeas corpus, all state remedies must be exhausted. See 28 U.S.C. § 2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275-76, 92 S. Ct. 509, 512-13 (1971); Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011). To satisfy the exhaustion requirement of 28 U.S.C. § 2254, "it is not sufficient merely that the [petitioner] has been through the state courts." Picard, 404 U.S. at 275-76, 92 S. Ct. at 512-13. Rather, the claims must be "fairly presented" to the state courts so that the state has an opportunity to correct any alleged constitutional violations. See Walker v. Martin, ___U.S. ___, 131 S. Ct. 1120, 1127 (2011);

Castille v. Peoples, 489 U.S. 346, 351, 109 S. Ct. 1056, 1060 (1989); Picard, 404 U.S. at 276, 92 S. Ct. at 513. If a petitioner has no available state forum in which to pursue a remedy because of a state procedural bar, his claim may be deemed exhausted, yet procedurally defaulted. See Teague v. Lane, 489 U.S. 288, 297-299, 109 S. Ct. 1060, 1068-1069 (1989); Carvajal, 633 F.3d at 104; Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991).

Petitioner claims that she received ineffective assistance of counsel because her attorney made incriminating statements about her at sentencing. Petitioner does not identify the specific statements that she finds inappropriate. Leaving aside this substantial omission, however, the claim cannot be heard in this proceeding.

Under New York law, all claims that are record-based must be raised on direct appeal. See Dunham v. Travis, 313 F.3d 724, 729 (2d Cir. 2002) ("In New York, a criminal defendant may not raise in a § 440 motion a claim that could have been raised on direct appeal."); C.P.L. § 440.10(2)(C) (requiring courts to deny a motion to vacate the judgment where "sufficient facts appear on the record" for the claim to have been raised and decided on direct appeal). Motions brought under § 440.10, collaterally challenging a conviction, must be denied when the error being raised is discernable from the trial record. See Sweet v. Bennett, 353 F.3d

24

135, 139 (2d Cir. 2003) ("New York law requires a state court to deny a motion to vacate a judgment based on a constitutional violation where the defendant unjustifiably failed to argue the constitutional violation on direct appeal despite a sufficient record."); accord Arce v. Smith, 889 F.2d 1271, 1272-73 (2d Cir. 1989)("Normally, under New York law, a claim of ineffective assistance of trial . . . counsel cannot be raised on appeal because its resolution often requires evidence not contained in the record on appeal  . . . [h]owever, the existence of an adequate record would render such claims properly reviewable on appeal before  . . .  the Appellate Division.").

Counsel's conduct at Petitioner's sentencing hearing can be discerned from the record.  Because the claim was not raised in Petitioner's direct appeal, it can no longer be heard.[17]   It is therefore deemed exhausted but procedurally barred from habeas review.  See Sweet, 353 F.3d at 139-40 (finding that petitioner's failure to raise ineffective assistance of counsel claim on direct appeal barred federal habeas review).

Because the claim is deemed exhausted but procedurally barred, this Court cannot adjudicate it on its merits unless Petitioner can demonstrate either (1) cause for the default and actual prejudice

---

[17] A defendant is entitled to only one direct appeal.  See Jimenez v. Walker, 458 F.3d 130, 149 (2d Cir. 2006); Aparicio v. Artuz, 269 F.3d 78, 91 (2d Cir. 2001) (citing to N.Y. Crim. Proc. Law § 450.10(1); N.Y. Ct. App. R. 500.1(a)).

or (2) that failure to consider the claim will result in a fundamental miscarriage of justice. <u>Coleman v. Thomas</u>, 501 U.S. 722, 749-50, 111 S. Ct. 2546, 2564-65 (1991).

To demonstrate cause for his default, a petitioner must show "that 'some objective factor external to the defense impeded [his] efforts' to raise the claim in state court." <u>McCleskey v. Zant</u>, 499 U.S. 467, 493, 111 S. Ct. 1454, 1470 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 467, 488, 106 S. Ct. 2639, 2645 (1986)); <u>see also Clark v. Perez</u>, 510 F.3d 382, 393 (2d Cir. 2008). Petitioner has not offered any such cause. She does claim that appellate counsel was ineffective for failing to raise unspecified constitutional claims, but does not tie that claim to this one. In any event, an ineffective assistance of appellate counsel claim cannot serve as cause to excuse the procedural default of another claim, unless the ineffective assistance of appellate counsel claim has itself been exhausted. <u>See</u> <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451-52 (2000) ("'[A] claim of ineffective assistance' . . . generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'") (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 489 (1986)). Petitioner has not exhausted his appellate counsel claim in the New York courts, because she has not raised it in any state court proceeding.

26

Petitioner, therefore, has not demonstrated cause for her failure to exhaust her ineffective assistance of trial counsel claim.

Alternatively, if a petitioner cannot show cause and resulting prejudice, he or she may still overcome a procedural bar by demonstrating a fundamental miscarriage of justice. This arises only in an "extraordinary case" in which "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 492, 106 S. Ct. 2639, 2647 (1986); accord Lebron v. Mann, 40 F.3d 561, 564 (2d Cir. 1994). Under this standard, a petitioner has the burden of demonstrating that he is "actually innocent" by showing that there is "a fair probability that . . . the trier of the facts would have entertained a reasonable doubt of his guilt." Lebron, 40 F.3d at 564 (quoting Kuhlmann v. Wilson, 477 U.S. 436, 455 n.17, 106 S. Ct. 2616, 2627 n.17 (1986)).

"Actual innocence means factual innocence, not mere legal insufficiency." Dunham, 313 F.3d at 730 (quoting Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998)) (internal quotation marks omitted). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence . . . ." Schlup v. Delo, 513 U.S. 298, 324, 115 S. Ct. 851, 865 (1995). Without new evidence of innocence, this Court cannot find that a miscarriage of justice occurred

27

without "asserting that none of the jurors acted reasonably." Lucidore v. N.Y. State Div. of Parole, No. 99 Civ. 2936(AJP), 1999 WL 566362, at *8 (S.D.N.Y. Aug. 3, 1999), aff'd, 209 F.3d 107 (2d Cir. 2000); see also Dunham, 313 F.3d at 730 ("[Petitioner] presented no new evidence of his innocence and did not make the necessary showing required . . . to bypass the procedural bars.").

Petitioner has not demonstrated her actual innocence because she presents no new evidence. Accordingly, this procedurally barred claim should be dismissed.

## V.   Additional Claims Brought In Petitioner's Reply

Petitioner's Reply contains additional claims which are not in the Petition and were never raised and exhausted in the New York courts. Specifically, Petitioner contends (1) the trial judge erred in allowing the jury to consider a First Degree Assault with Intent to Disfigure count after it had acquitted Petitioner of First Degree Assault with a Deadly Weapon/Dangerous Instrument; (2) she was denied the right to a speedy trial; (3) the trial judge improperly excused a juror for cause, on the People's request, over her attorney's objection; (4) the trial judge's refusal to allow the testimony of a witness for the defense denied Petitioner her right to present a defense; and (5) appellate counsel was ineffective for failure to preserve unspecified constitutional claims. Petitioner requests an evidentiary hearing and a stay of

this proceeding so that she may present these unexhausted claims in a state court collateral challenge to her conviction, through a § 440 motion.

### A.   The Claims in the Reply are Time-Barred

The claims brought in the Reply are time-barred. Under AEDPA, there is a one-year statute of limitations governing habeas corpus petitions brought by state prisoners. The statute of limitations ordinarily begins to run when a conviction becomes final. See 28 U.S.C. § 2244(d)(1)(A). Where an appeal is sought with the New York Court of Appeals, a judgment becomes final ninety days from the date on which leave to appeal is denied, which is the amount of time a prisoner has to petition the United States Supreme Court for a writ of certiorari. See Sup. Ct. R. 13; Clay v. United States, 537 U.S. 522, 525, 123 S. Ct. 1072, 1075 (2003); Williams v. Artuz, 237 F.3d 147, 150 (2d Cir. 2001). A properly filed application for state post-conviction relief may toll the limitations period. See Acosta v. Artuz, 221 F.3d 117, 119 (2d Cir. 2000).

The New York Court of Appeals denied Petitioner leave to appeal on March 19, 2009. See Noakes, 12 N.Y.3d at 786. The statute of limitations started to run on June 17, 2009, ninety days after leave to appeal was denied. Petitioner did not file for a writ of certiorari with the Supreme Court, nor did she pursue a

state collateral challenge to her conviction.  Therefore, the one-year limitations period expired on June 17, 2010.

The Reply was filed on January 21, 2011, seven months after the one-year limitations period expired.  The filing of a federal habeas petition does not serve to toll the statute of limitations. See Duncan v. Walker, 533 U.S. 167, 181-82, 121 S. Ct. 2120, 2129 (2001) (only state collateral proceedings may toll the one-year limitations period under 28 U.S.C. § 2244(d)(2)).  Each claim a petitioner seeks to assert must come within the one-year limitations period.  See Mayle v. Felix, 545 U.S. 644, 622, 125 S. Ct. 2562, 2573-74 (2005) ("If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.").  Because the claims raised in the Reply were brought seven months after the statute of limitations expired,  unless these claims relate back to the date on which the Petition was filed they are time-barred.

Amendments to a habeas petition relate back to the date on which the petition was filed only where the amendments arise out of the same "conduct, transaction, or occurrence" as timely filed claims.  Fed. R. Civ. P. 15(c)(1)(B).  A petitioner's trial and conviction are not the occurrences or conduct to which amendments can appropriately relate back.  Rather, the original and proposed

30

claims must "be tied to a common core of operative facts."  Mayle,
545 U.S. at 664, 125 S. Ct. at 2575; see also id. at 662, 125 S.
Ct. at 2573-74.

None of the claims in the Reply rely on the same operative
facts as those in the original Petition.  These claims, therefore,
do not relate back to the date on which the Petition was filed and
are time-barred.[18]   Accordingly, this Court recommends that the
claims asserted in Petitioner's Reply be dismissed as time-barred.[19]

### CONCLUSION

For the foregoing reasons, this Court respectfully recommends
that Petitioner's sufficiency of the evidence claim and jury claim
should be dismissed on their merits, and her ineffective assistance
of counsel claim should be deemed exhausted and procedurally
barred.  All of the claims in Petitioner's Reply should be
dismissed as time-barred.  Accordingly, the Petition should be
dismissed with prejudice.  Further, because Petitioner has not made
a substantial showing of a denial of a federal right, this Court
recommends that no certificate of appealability be issued. See 28

---

[18] Because the claims are time-barred, there is no reason to
stay this action in order to allow Petitioner to return to the
New York courts to attempt to exhaust them.

[19] Four of the five claims in the Reply are also procedurally
barred from review.  These claims are record-based and were not
raised on direct appeal.  They therefore can no longer be raised
in the New York courts and are deemed exhausted and procedurally
barred.

U.S.C. § 2253(c)(2); <u>Lucidore v. New York State Div. of Parole</u>, 209 F.3d 107, 112 (2d Cir. 2000).  This Court further recommends certification, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from the Court's order would not be taken in good faith. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 445-46, 82 S. Ct. 917, 921 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)© and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this report to file written objections. <u>See also</u> Fed. R. Civ. P. 6(a).  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Colleen McMahon, United States District Judge, and to the chambers of the undersigned, Room 1660.  Any requests for an extension of time for filing objections must be directed to Judge McMahon.  Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: December 21, 2011
       New York, New York